804 So.2d 736 (2001)
LOUISIANA GAMING CORPORATION, Plaintiff-Appellant,
v.
KAYELL ENTERPRISES, INC., d/b/a Industrial Coffee Shop, Defendant-Appellee.
No. 35,297-CA.
Court of Appeal of Louisiana, Second Circuit.
December 5, 2001.
Rehearing Denied January 17, 2002.
*737 Onebane, Bernard, Torian, Diaz, McNamara & Abell by Frank H. Spruiell, Jr., Shreveport, Counsel for Appellant.
Lance P. Havener, Shreveport, Counsel for Appellee.
Before STEWART, GASKINS and CARAWAY, JJ.
STEWART, J.
This is an appeal by Louisiana Gaming Corporation (LGC) from a judgment rejecting its demands for injunctive relief, specific performance and damages following the alleged breach of a contract by Kayell Enterprises, Inc. For the following reasons, we affirm.

FACTS
The Industrial Coffee Shop is a restaurant located in Shreveport, Louisiana. For many years, it was owned and operated by Henry and Edna Barajas. On March 24, 1995, the Barajas signed a five-year contract with Southwest Gaming Services (SGS) for the placement of video poker gaming machines in the restaurant. The contract gave SGS exclusive rights to install the machines at the restaurant on the condition that the profits from the machines would be divided equally between the Barajas and SGS. The contract provided that it was to be effective against any purchaser of the premises. However, the "exclusive rights" provision of the contract provided that the agreement could be terminated earlier than the five year term by SGS simply by removing its machines from the premises. This contract was recorded in the Caddo Parish conveyance records.
In October 1997, the Barajas sold the restaurant property and buildingsbut not the business itself or its movablesto Kayell Enterprises, Inc. (Kayell). Kayell is a corporation owned in its entirety by Mr. Krishan Bhatia. Kayell did not purchase the entire business outright because it had not yet obtained license to operate video poker machines. In preparation for operating the business, Mr. Bhatia and his daughter Kanta Dhaliwal investigated other *738 video poker equipment providers. During this process, Kayell was approached by LGC, a competitor of SGS, who wished to purchase the business from them. However, an agreement could not be reached regarding the prosed sale, but Kayell agreed to allow LGC to provide video poker machines for their business. On January 5, 1998, Kayell, through Mr. Bhatia, signed a contract agreeing to allow LGC the exclusive right to place video poker machines at the restaurant for 60 months:
commencing on the date of execution hereof or on such date that LGC places the first video draw poker device in the Establishment and the machines are turned on and available for customer play, whichever is the later date.
Although the contract does not itself utilize the term, the agreement defines "commencement date" as follows:
"Commencement Date"shall mean the date of execution hereof or on such date that LGC places the first video draw poker device in the Establishment and the machines are turned on and available for customer play, whichever is the later date. However, this agreement is binding to the signed parties at the time of execution. LGC shall place at least one device in the Establishment within fifteen (15) days after the Establishment's license (sic) granted.
In a section captioned Special Conditions, the contract further provides, in part:
It is understood that this agreement shall begin on the effective ending date of the preceding contractual agreement. LGC agrees to spend up to $25,000.00 for lease hold improvements to the Establishment, any monies spent above the allocated twenty-five thousand will be repaid by Kayell Enterprises, Inc. through the operation of video draw poker devices at a reasonable deducted amount.
Kanta Dhaliwal, who negotiated the contract on behalf of Kayell, stated that the minimum of $25,000 LGC offered to provide for renovations was the primary factor that caused Kayell to choose their services. A copy of this contract is attached as an unpublished appendix to this opinion. Coincident with the signing of this contract, LGC representative Billy Allen applied to the Louisiana State Police for a gaming license for Kayell.
In February 1998, in anticipation of the receipt of the video poker license, Kayell purchased the business itself and its movables from the Barajas. This contract provided, in part:
7.1 Business Debts: Purchaser does not assume or agree to be responsible for any debts, contracts or obligations of Seller in connection with the operation of a business at 1100 Joseph Street, Shreveport, Louisiana, and Seller agrees to hold Purchaser harmless therefrom.
According to Mr. Bhatia, this provision was intended to relieve Kayell from any obligation under the Barajas' contract with SGS. However, despite this provision and the new contract with LGC, Kayell did not immediately remove the SGS poker machines from the restaurant because it did not have a license to operate the machines on its own.
Mr. Bhatia testified that his gaming license to operate video poker machines was approved in late February 1998 (State Police records indicate February 25, 1998), and that he thereafter tried "a number of times" via telephone to contact Billy Allen, the LGC representative, to have LGC install its machines. He testified:
A: ... And whenever I called they would ask who's calling, I would give my name. I'm told he's not there, he was out. I would leave a message for him to *739 contact me, and the message was never returned.
Q: How many times can you estimate you tried to call Mr. Allen?
A: If I remember correctly, off and on the whole month of March, March 1998.
Mr. Bhatia said that he was never able to speak to Mr. Allen. Likewise, Kanta Dhaliwal testified that she tried "very repeatedly" during March 1998 to contact Mr. Allen but stopped "after March or soon after" because she received no response to her repeated phone calls.
Mr. Allen testified that he met with Kanta Dhaliwal on several occasions following the grant of Kayell's video poker license, probably in mid-1998, to discuss the planned renovation of the restaurant's gaming area. In fact, Allen testified that the restaurant's gaming license was discussed on "several occasions." He said that, normally, the licensee would contact him upon receipt of the license and the licensee would fax a copy to LGC for its records, but that this procedure did not occur in this case. Allen had no records of any meeting with Kanta Dhaliwal and LGC did not keep records of telephone calls.
The restaurant maintained its relationship with SGS until May 1999, when Kayell bought and installed its own machines and SGS removed its machines. On February 10, 2000, LGC filed suit against Kayell and sought injunctive relief, specific performance and monetary damages. Trial of this matter was held on March 14, 2001, and on March 16, 2001, the court signed a judgment rejecting LGC's demands. The court found that LGC failed to comply with the contract when it failed to place a video poker machine at the restaurant within 15 days of the approval of Kayell's gaming license. The court also found that the contract suspended the LGC's obligation until the SGS contract expired, and the court gave the date of expiration as April 1999. The court further found that Kayell did not attempt to prevent LGC from learning when either of these conditions occurred. LGC now appeals.

DISCUSSION
LGC has asserted three assignments of error on appeal:
1. The trial court's judgment is manifestly erroneous based upon the conclusion that LGC breached the terms and conditions of the video poker agreement with Kayell.
2. The trial court's judgment is manifestly erroneous based upon the conclusion that Kayell had no contractual or legal duty to inform LGC when the Southwest Gaming contract ended.
3. The trial court's judgment is manifestly erroneous in failing to find that Kayell breached the terms and conditions of the video poker agreement with LGC by placing its own video poker machines in the Industrial Coffee Shop in May 1999.
La. C.C. art. 2045 provides:
Interpretation of a contract is the determination of the common intent of the parties.
La. C.C. art. 2046 provides:
When the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent.
La. C.C. art. 2047 provides:
The words of a contract must be given their generally prevailing meaning. Words of art and technical terms must be given their technical meaning when the contract involves a technical matter.
The contract between LGC and Kayell is susceptible of at least two interpretations *740 concerning its commencement date. First is the provision:
This Agreement shall be for an initial term of 60 months, commencing on the date of execution hereof or on such date that LGC places the first video draw poker device in the Establishment and the machines are turned on and available for customer play, whichever is the later date.
The contract's definition of "commencement date" likewise gives a similar date and, separately from the definition of this unused term, specifies that LGC "shall" place at least one machine in the restaurant within 15 days of the grant of the restaurant's gaming license. Second is the provision specifying in part:
It is understood that this agreement shall begin on the effective ending date of the preceding contractual agreement.
These provisions are inconsistent because they provide for two distinctly different commencement dates.
Despite the trial court's finding that the contract was unambiguous, there are a number of inconsistencies in the contract. The court's finding of unambiguity coupled with each party's poor development of the facts in this case leaves many holes in the story. Nonetheless, circumstances dictate that the agreement between LGC and Kayell should have commenced with LGC's placement of a gaming machine in the restaurant within 15 days of the issuance of Kayell's gaming license. We cannot reasonably interpret the LGC-Kayell agreement as commencing on the expiration of the SGS-Barajas agreement. The SGS-Barajas contract, signed on March 24, 1995, specified that it began upon either the commencement of licensed gaming activities or the installation by SGS of video gaming devices "unless earlier terminated or extended pursuant to the terms hereof." The contract further specified that it terminated five years after commencement and would automatically renew in the absence of written notice by the restaurant within 60 days of the end of the term. Assuming arguendo that SGS installed video poker machines in the restaurant on the day the agreement was signed, the earliest that the SGS contract with the Barajas terminated was March 24, 2000. If Kayell were bound by the agreement, its removal of SGS' machines prior to that date would be a breach of the agreement.
Clearly there were many events concerning gaming at the restaurant that occurred before this date. Most importantly, LGC filed its lawsuit against Kayell in February 2000, prior to the earliest possible expiration date of the SGS contract. In its petition, LGC urged that its agreement with Kayell was then in force and LGC sought damages for Kayell's alleged violation of the exclusivity provision of the agreement in that Kayell placed its own video poker machines in the restaurant. We find this assertion inconsistent with LGC's current argument that its contract with Kayell and its obligation to perform commenced only upon the termination of the Barajas' contract with SGS. At the time it filed its petition, LGC clearly did not believe that Kayell was somehow bound by the agreement between the Barajas and SGS even though that earlier agreement specified that any purchaser of the business would be bound by its terms. Under the circumstances, it is not necessary to decide whether this earlier recorded agreement bound Kayell. Likewise, the provision in the definition of "commencement date" specifying that the agreement was binding to the signed parties at the time of its execution does not support LGC's position because LGC was clearly aware that Kayell was operating the SGS poker machines at the time of the *741 execution of the LGC agreementa violation of the agreement's exclusivity clause. Additionally, LGC's argument that it believed Kayell to be bound by the SGS contract until March 2000 is inconsistent with its having conducted meetings with Kayell in the spring of 1998 regarding the renovations of the restaurant. Moreover, if LGC thought that the SGS contract was binding on Kayell, it would make no sense for LGC to offer to purchase a business that was subject to a contract with one of its competitorsSGS. Because we reach this conclusion, we do not address LGC's arguments that Kayell had an obligation to notify LGC of the termination, if any, of the Barajas contract with SGS.
La. C.C. art. 2054 provides:
When the parties made no provision for a particular situation, it must be assumed that they intended to bind themselves not only to the express provisions of the contract, but also to whatever the law, equity, or usage regards as implied in a contract of that kind or necessary for the contract to achieve its purpose.
La. C.C. art. 2057 provides:
In case of doubt that cannot be otherwise resolved, a contract must be interpreted against the obligee and in favor of the obligor of a particular obligation. Yet, if the doubt arises from lack of a necessary explanation that one party should have given, or from negligence or fault of one party, the contract must be interpreted in a manner favorable to the other party whether obligee or obligor.
Both Krishan Bhatia and Kanta Dhaliwal testified that after the restaurant's license was approved in February 1998, they repeatedly attempted to contact Mr. Allen with LGC and that Mr. Allen never returned their phone calls. Mr. Allen said that he met with Mrs. Dhaliwal in mid-1998 but had no record of this meeting. Even if we imply a requirement that Kayell notify LGC of the issuance of its license, the evidence shows that LGC should have known by mid-1998 at the latest that Kayell was ready to commence performance under the contract. Additionally, LGC helped Kayell apply for the video poker license because it was more than familiar with the process of licensing. Consequently, LGC cannot posit itself as a party dependent upon Kayell for information regarding the video poker application process. Moreover, because LGC wrote the contract, any doubt that cannot be otherwise resolved must be interpreted against the party that furnished its text. La C.C. art. 2056.
La. C.C. art. 2013 provides in part:
When the obligor fails to perform, the obligee has a right to the judicial dissolution of the contract or, according to the circumstances, to regard the contract as dissolved. In either case, the obligee may recover damages....
La. C.C. art. 2015 provides:
Upon a party's failure to perform, the other may serve him a notice to perform within a certain time, with a warning that, unless performance is rendered within that time, the contract shall be deemed dissolved. The time allowed for that purpose must be reasonable according to the circumstances.
The notice to perform is subject to the requirements governing a putting of the obligor in default and, for the recovery of damages for delay, shall have the same effect as a putting of the obligor in default.
La. C.C. art. 2016 provides:
When a delayed performance would no longer be of value to the obligee or when it is evident that the obligor will not perform, the obligee may regard the *742 contract as dissolved without any notice to the obligor.
Although neither party offered written documentation of its efforts to contact the other, the trial court apparently accepted the testimony of Krishan Bhatia and Kanta Dhaliwal stating that they simply gave up trying to contact LGC after nearly a month of repeated telephone calls. Although under other circumstances a series of unreturned telephone calls may not be sufficient to make it evident that the obligor will not perform, we find no error in the trial court's conclusion. Although Mr. Allen said that he discussed the subject of the Kayell license with Mrs. Dhaliwal in mid 1998, there was no explanation given why LGC would not have begun to perform at that time.

CONCLUSION
For the above reasons, the judgment of the trial court is affirmed. Costs of this appeal are assessed to plaintiff, Louisiana Gaming Corporation.
AFFIRMED.
CARAWAY, J., dissents with written reasons.
CARAWAY, J., dissenting.
I respectfully dissent from the majority's ruling.
All agree that the commencement date for LGC's performance was not January 5, 1998, the date of the contract's execution, despite some language in the contract to the contrary. Thus, when was LGC's obligation to perform under the contract to commence? The trial court narrowed the alternatives in its oral reasons for judgment, as follows:
The effective date of the agreement in the context of when the parties each have obligations is effectively, based on the facts presented, fifteen days after the license is obtained by the defendant, which in this case was February 25, 1998. The contract by its own terms suspends the effective date of the contract and the obligations of each of the parties under that agreement to the date or ending date of the Southwest Gaming contract, which was referred to as the preceding contract, which was executed in 1995.
Although that language suggests that the trial court determined the time of performance for LGC as "the effective ending date of the preceding [SGS] contractual agreement," the trial court ultimately ruled, inexplicably, that the effective date for performance was within fifteen days of February 25, 1998 when Kayell received its license. The majority follows that ruling, as though bound by the manifest error rule, when the law of obligations and contracts requires otherwise.
If we accept Kayell's view that LGC was bound to perform within fifteen days of the February 25 license, we should do so only after recognizing Kayell's further position regarding the SGS contract. From their limited testimony, Kanta Dhaliwal and Mrs. Bhatia indicated that an unproduced agreement was reached with SGS so that notice by Kayell to remove the SGS gaming machines from the premises within 24 hours would be honored. There was no testimony concerning when that agreement was reached or whether LGC was given notice of the agreement. There was no testimony that LGC ever learned on February 25 that Kayell received its license. Thus, on February 25, 1998, while the SGS machines remained in operation on the premises, LGC apparently had no actual notice of the issuance of Kayell's license and could not have been expected to commence its obligation of performance by renovation of the premises while the SGS machines remained.
*743 While I can agree, taking Kayell's view of the facts of February 25, that LGC could have begun performance under the contract, Kayell's right to dissolve the contract for non-performance is governed by La. C.C. art. 2015, as cited by the majority, and by the requirements governing a putting of the obligor in default as set forth under Articles 1990 and 1991 of the Civil Code. See comment (c) to La. C.C. art. 2015. Those provisions of law do not allow a finding under these circumstances that LGC breached the contract or that the contract may be regarded as dissolved because LGC "should have known" to perform.
LGC's time for performance was not fixed or clearly determinable on January 5 when the contract was executed because Kayell's license was in doubt and the term and binding force of the SGS contract was unclear. Under Article 1990, the "mere arrival" of February 25, when those conditions of the agreement first became clearly attainable in the eyes of Kayell, did not mean that LGC had immediate notice to commence performance as though its obligation to perform had been fixed all along. Article 1990 therefore requires a showing by Kayell that LGC was put in default. La. C.C. art. 1991 then provides as follows:
An obligee may put the obligor in default by a written request of performance, or by an oral request of performance made before two witnesses, or by filing suit for performance, or by a specific provision of the contract.
From my review of these provisions of the Civil Code and the evidence, Kayell failed to give written notice to LGC that it had obtained its license and that the SGS gaming machines would be immediately removed from the premises. The failure to put LGC in default and to give it an opportunity to perform under the contract requires reversal.
APPLICATION FOR REHEARING
Before NORRIS, C.J., STEWART, GASKINS, CARAWAY, and KOSTELKA, JJ.
Rehearing denied.
CARAWAY, J., would grant rehearing.